1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FILED
CLERK, U.S. DISTRICT COURT

6/9/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CD _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

March 2022 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>ARGISHTI KHUDAVERDYAN,<br>　aka "Argo,"<br>　aka "George Gale,"<br>　aka "akhudav1," and<br>ALEN GHAREHBAGLOO,<br>　aka "aghareh1,"<br><br>　　　　Defendants. | CR 19-0339(A)-SVW<br><br>F I R S T<br>S U P E R S E D I N G<br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 1344(2): Bank Fraud; 18 U.S.C. § 1030(a)(2)(c), (c)(2)(B)(i), (c)(2)(B)(ii): Unauthorized Access to a Protected Computer to Obtain Information; 18 U.S.C. § 1030(a)(4), (c)(3)(A): Accessing a Computer to Defraud and Obtain Value; 18 U.S.C. § 1956(h): Conspiracy to Launder Monetary Instruments; 18 U.S.C. § 1956(a)(1)(B)(i): Laundering of Monetary Instruments; 18 U.S.C. § 1957(a): Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; 18 U.S.C. § 1028A(a)(1): Aggravated Identity Theft; 18 U.S.C. § 2(a): Aiding and Abetting; 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(2)(A), 982(a)(2)(B), and 1028 and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1349]

A.   INTRODUCTORY ALLEGATIONS

At all times relevant to this First Superseding Indictment:

Defendants and Co-Conspirators

1.   Defendant ARGISHTI KHUDAVERDYAN, also known as ("aka")
"Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN") was a
resident of Northridge or Burbank, California.  From on or about
January 18, 2017, to on or about June 17, 2017, defendant
KHUDAVERDYAN was a co-owner of a T-Mobile Premium Retail ("TPR")
store called Top Tier Solutions Inc. in Los Angeles, California.

2.   Defendant ALEN GHAREHBAGLOO, aka "aghareh1"
("GHAREHBAGLOO") was a resident of Glendale or Montrose, California.
From on or about January 18, 2017, to on or about June 17, 2017,
defendant GHAREHBAGLOO was a co-owner of a TPR store called Top Tier
Solutions Inc. in Los Angeles, California.

T-Mobile and Metro

3.   T-Mobile US, Inc. ("T-Mobile") was a company with
headquarters in Bellevue, Washington, and offices throughout the
United States and Puerto Rico.  Metro by T-Mobile (formerly known as
MetroPCS) was a company with headquarters in Richardson, Texas, that
was acquired by T-Mobile USA on or about May 1, 2013.  T-Mobile did
not have any email servers in California.

4.   T-Mobile sold cellular devices including phones and offered
monthly voice and data plans for use with the devices on the T-Mobile
wireless network.  T-Mobile devices and wireless services were sold
through authorized T-Mobile dealers and retailers, including TPR
stores, throughout the United States and Puerto Rico.

5.    New cellular devices, such as iPhones, cost hundreds of dollars, with many top-end models costing approximately $500 to $1,000.  To make phones more affordable, T-Mobile, in or about March 2013, began to provide customers with the option to purchase phones on an interest-free equipment installment plan.  To be eligible, customers were required to meet a minimum credit profile to qualify for financing for up to 24 months, which in turn locked their devices to T-Mobile's wireless network.  The equipment agreement between T-Mobile and each of its customers provided that T-Mobile would unlock the customer's phone upon the satisfaction of certain criteria, such as when the customer had satisfied the terms of her or his equipment installment plan.

6.    T-Mobile used proprietary locking software on cellular devices' International Mobile Equipment Identity ("IMEI") numbers to prevent the locked devices from being used on other cellular service providers' networks.

7.    "Unlocking" or "whitelisting" a phone removed the proprietary locking software and thereby allowed the phone to be used on other cellular providers' mobile networks rather than exclusively with T-Mobile.  "Blocking" or "blacklisting" a phone rendered it ineligible for activity on the T-Mobile network and was done by authorized T-Mobile employees, for example, if the phone was reported lost or stolen.  Removing a block on a phone was also referred to as "unblocking" or "cleaning" the phone, which, together with unlocking and whitelisting, is collectively referred to herein as unlocking.

8.    Unlocked phones were a valuable commodity because they could be resold and used on any other compatible network around the world.  If a T-Mobile customer's phone was unlocked, that customer

3

1  could switch to another carrier.  If this happened without
2  authorization, T-Mobile would be deprived of the remaining value of
3  the customer's service revenues and, if applicable, remaining
4  payments under the customer's equipment plan.

5      9.   Personnel at T-Mobile's call centers, which are located
6  across the United States and around the globe, had access to T-
7  Mobile's computer systems and internal network to assist T-Mobile
8  customers with service and billing issues.  Among other things,
9  certain authorized T-Mobile employees at the call centers had the
10 ability to submit device unlock requests on behalf of eligible
11 customers.

12     10.  T-Mobile's mobile device unlocking application, called the
13 Mobile Device Unlock ("MDU") tool, was the proprietary application
14 used by authorized T-Mobile employees to unlock an Android phone.

15     11.  T-Mobile's IMEI blocking tool (the "IMEI tool") was the
16 proprietary application used by authorized T-Mobile employees to
17 remove a block, thereby re-enabling the device to access T-Mobile's
18 cellular network.

19     12.  Until on or about March 22, 2017, both the MDU and IMEI
20 tools were accessible through the internet to authorized users with
21 valid T-Mobile employee credentials; after that date the MDU and IMEI
22 tools were only accessible to authorized users through T-Mobile's
23 internal and protected corporate network.

24     13.  Metro by T-Mobile had its own cell phone unlocking tool for
25 Metro cell phones called "MCare Unlock" (the "MCare tool"), which was
26 a web-based tool hosted externally to T-Mobile and designed for use
27 by Metro business support personnel and external call center customer
28 service representatives.  No end user authentication was required to

4

use the MCare tool.  Access to the MCare tool was based on a set of IP address blocks assigned to T-Mobile/Metro locations.

14.  TPRs were independently owned T-Mobile premium retailer partner locations that were authorized to sell T-Mobile accessories, handsets, and service to customers.  TPR dealers had access to the MDU tool until on or about December 16, 2016.

Definitions

15.  Phishing was the fraudulent practice of sending emails purporting to be from a reputable or familiar source, such as a friend or employer, financial institution, social media company, or internet service provider, to victims in order to induce the victims to reveal sensitive information, such as: names, addresses, Social Security numbers, dates of birth, and mothers' maiden names (collectively, "PII"); and employee usernames and passwords (collectively, "employee credentials").  In a typical phishing scheme, the phishing email contains a link to a website that purports to be a legitimate business website but is, in fact, operated by a computer attacker.  The website prompts the victim to enter his or her PII and/or employee credentials, which are then collected and delivered to a server or an email account belonging to the computer attacker.

16.  A media access control ("MAC") address is a hardware identification number assigned by the manufacturer that uniquely identifies each digital device that connects to a network.  A MAC address can be changed using software.

17.  J.P. Morgan Chase & Co. ("Chase") was a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation.

1    18.  Google LLC ("Google"), located in Mountain View,
2  California, operated computers used by subscribers all over the world
3  in interstate and foreign commerce and communications, and did not
4  have any email servers in California.

5    19.  PayPal Holdings, Inc. ("PayPal") was a U.S. company that
6  operated a worldwide online payment system that supported online
7  money transfers.  PayPal was a wholly-owned subsidiary of eBay Inc.
8  until on or about July 18, 2015, when PayPal became an independent
9  company.  PayPal's Mass Payment feature enabled a PayPal business
10  account to send money to a group of up to 5,000 people at once as
11  long as individual payments did not exceed $10,000.

12  B.   OBJECT OF THE CONSPIRACY

13    20.  Beginning on a date unknown to the Grand Jury but no later
14  than August 26, 2014, and continuing through on or about
15  June 10, 2019, in Los Angeles County, within the Central District of
16  California, and elsewhere, defendants KHUDAVERDYAN and GHAREHBAGLOO
17  and others, known and unknown to the Grand Jury, knowingly combined,
18  conspired, and agreed to commit wire fraud, in violation of Title 18,
19  United States Code, Section 1343.

20  C.   MANNER AND MEANS OF THE CONSPIRACY

21    21.  The object of the conspiracy was carried out, and to be
22  carried out, in substance, as follows:

23        a.   Defendants KHUDAVERDYAN and GHAREHBAGLOO would
24  advertise their cell phone unlocking services to potential customers,
25  and would falsely claim that their T-Mobile unlocks were official and
26  directly through T-Mobile, through email and websites they controlled
27  such as unlocks247.com and swiftunlocked.com.

28

1          b.    Defendants KHUDAVERDYAN and GHAREHBAGLOO would obtain

2   the IMEI numbers of cell phones that customers wanted unlocked by

3   offering customers the ability to enter the IMEI numbers on websites

4   defendants KHUDAVERDYAN and GHAREHBAGLOO controlled, which would

5   generate emails with the IMEI numbers that would be sent directly to

6   an email address controlled by defendant KHUDAVERDYAN.

7          c.    Defendants KHUDAVERDYAN and GHAREHBAGLOO also would

8   obtain the IMEI numbers of cell phones that customers wanted unlocked

9   by exchanging emails with each other, their customers and potential

10  customers, and brokers offering unlocking services.

11         d.    In order to gain access to T-Mobile's protected

12  internal computers without authorization, defendant KHUDAVERDYAN

13  would obtain employee credentials of T-Mobile employees through

14  various means, including by causing phishing emails to be sent via

15  the wires in interstate and foreign commerce to T-Mobile employees.

16  Those emails appeared to be legitimate T-Mobile correspondence with

17  links to websites that defendant KHUDAVERDYAN controlled, such as

18  verifying-mail.us, which would request that the employees log in with

19  their employee credentials so that defendant KHUDAVERDYAN could

20  harvest the T-Mobile employees' credentials when they were entered

21  into the websites.  Defendants KHUDAVERDYAN's and GHAREHBAGLOO's

22  objective was to sell to members of the public the resulting ability

23  fraudulently to unlock phones, so that members of the public could

24  stop using T-Mobile's services and thereby deprive T-Mobile of the

25  stream of payments it was owed under the customers' service contracts

26  and installment plans.

27         e.    Defendants KHUDAVERDYAN and GHAREHBAGLOO, assisted by

28  an unindicted co-conspirator referred to as Individual A, used the

1  Wi-Fi access points of T-Mobile Stores to log into T-Mobile's
2  internal network using compromised employee credentials, and used the
3  MDU, IMEI, and MCare tools to unlock cell phones originally issued
4  for T-Mobile's network even though neither defendant KHUDAVERDYAN nor
5  defendant GHAREHBAGLOO had authorization to use those tools.

6       f.   Defendants KHUDAVERDYAN and GHAREHBAGLOO would be paid
7  for unlocking cell phones, including, by way of example, the
8  following payments:

9            i.   Defendant KHUDAVERDYAN received in his PayPal
10 account ending in 7206:

11            (I)   approximately 40 payments totaling
12 approximately $551,799.91 from the PayPal account ending in 4028;

13            (II)  approximately 546 payments totaling
14 approximately $5,297,790 from the PayPal account ending in 4376;

15            (III)    approximately 1,186 payments totaling
16 approximately $10,766,321.50 from the PayPal account ending in 2898;
17 and

18            (IV)  approximately 119 payments totaling
19 approximately $1,195,492.86 from the PayPal account ending in 1200.

20            ii.   Defendant GHAREHBAGLOO received in his PayPal
21 account ending in 1813:

22            (I)   approximately 87 payments totaling
23 approximately $859,482.79 from the PayPal account ending in 1200;

24            (II)  approximately 23 payments totaling
25 approximately $220,020 from the PayPal account ending in 4376; and

26            (III)    approximately 113 payments totaling
27 approximately $1,084,306.15 from the PayPal account ending in 2898.

28

D.    OVERT ACTS

22.   On or about the following dates, in furtherance of the conspiracy, and to accomplish its object, defendants KHUDAVERDYAN and GHAREHBAGLOO and others, known and unknown to the Grand Jury, committed and willfully caused others to commit the following overt acts, among others, in the Central District of California, and elsewhere:

Overt Act No. 1:   On or about February 26, 2015, defendant KHUDAVERDYAN registered the domain unlocks247.com in the name of his cousin with the U.S. domain name service provider GoDaddy.com.

Overt Act No. 2:   On or about January 12, 2016, defendant KHUDAVERDYAN registered the domain newunlock.com with the U.S. domain name service provider Wild West Domains LLC, for which he later solicited help to build a new banner ad design for his "Cell Phone Unlocking Business."

Overt Act No. 3:   On or about February 23, 2016, defendant KHUDAVERDYAN emailed Phantom Software, a phishing software provider, and stated: "I have an unlocking site and Im interested in buying your software."

Overt Act No. 4:   On or about April 17, 2016, defendant KHUDAVERDYAN received an email with a link to T-Mobile's internal employee credential registration portal.

Overt Act No. 5:   On or about April 18, 2016, defendant KHUDAVERDYAN received an email with the message "symnatec setup bro, read it," and attaching T-Mobile's internal instruction manual for installing a Symantec authentication token to enable the use of T-Mobile's web-based email system.

Overt Act No. 6:   On or about April 22, 2016, defendant KHUDAVERDYAN received an email with a link to T-Mobile's web-based email system.

Overt Act No. 7:   On or about April 22, 2016, defendant KHUDAVERDYAN received an email with the compromised employee credential of a T-Mobile employee with the initials C.R.

Overt Act No. 8:   On or about May 20, 2016, defendant KHUDAVERDYAN made a payment from his PayPal account ending in 7206 to the domain name service StableHost.com for the domain swiftunlocked.com in the amount of $149.90, an amount he paid monthly until on or about May 20, 2018.

Overt Act No. 9:   On or about May 23, 2016, defendant KHUDAVERDYAN received an email containing approximately 128 IMEI numbers, 117 of which defendant KHUDAVERDYAN unlocked using the compromised employee credential of a T-Mobile employee with the initials M.T.

Overt Act No. 10:   On or about May 24, 2016, defendant KHUDAVERDYAN registered the domain unlockitall.com with the German domain name service provider Vautron Rechenzentrum AG.

Overt Act No. 11:   On or about May 25, 2016, defendant GHAREHBAGLOO registered the domain tryunlock.com with the U.S. domain name service provider GoDaddy Inc., on which he later advertised: "Our company provides direct premium unlocking services for all phone carriers."

Overt Act No. 12:   From on or about May 27, 2016, through on or about July 9, 2016, defendant KHUDAVERDYAN received approximately 6,140 emails generated by his website swiftunlocked.com with a total of approximately 6,177 IMEI numbers.

1    <u>Overt Act No. 13</u>:   From on or about June 7, 2016, through on or

2    about August 3, 2016, defendant KHUDAVERDYAN received approximately

3    6,270 emails generated by his website swiftunlocked.com from

4    defendant GHAREHBAGLOO with a total of approximately 6,311 IMEI

5    numbers.

6    <u>Overt Act No. 14</u>:   On or about August 25, 2016, defendant

7    GHAREHBAGLOO messaged a customer that access to T-Mobile phone

8    unlocking was "down all over" and added, "Bye bye Philippines call

9    center."

10   <u>Overt Act No. 15</u>:   On or about October 7, 2016, defendant

11   KHUDAVERDYAN received in his PayPal account ending in 4961

12   approximately two payments totaling approximately $305.26 from the

13   PayPal account ending in 1200, both of which included the description

14   "Unlocks 24/7 – Invoice."

15   <u>Overt Act No. 16</u>:   On or about October 13, 2016, using the

16   PayPal account ending in 4961, defendant KHUDAVERDYAN registered the

17   domain verifying-mail.us with the U.S. domain name service provider

18   Name.com.

19   <u>Overt Act No. 17</u>:   On or about November 4, 2016, defendant

20   KHUDAVERDYAN advertised "USA T-MOBILE UNLOCKS" on the website

21   unlockitall.com, including an "Official Unlock App" for Android

22   devices on the T-Mobile and MetroPCS networks.

23   <u>Overt Act No. 18</u>:   In or about December 2016, defendant

24   KHUDAVERDYAN caused a phishing email to be sent to a T-Mobile

25   employee with the initials M.M. containing a link that, when M.M.

26   clicked on it, redirected M.M. to the domain verifying-mail.us, from

27   which defendant KHUDAVERDYAN harvested the employee credentials

28   entered by M.M.

1     <u>Overt Act No. 19:</u>   On or about December 13, 2016, defendant
2  KHUDAVERDYAN used M.M.'s employee credentials to access T-Mobile's
3  internal network and unlock one T-Mobile IMEI number.

4     <u>Overt Act No. 20:</u>   On or about December 16, 2016, defendant
5  KHUDAVERDYAN, using M.M.'s employee credentials, caused a phishing
6  email to be sent from M.M.'s T-Mobile email account to T-Mobile
7  employees with the initials M.G. and F.Z. containing a link that,
8  when clicked on, redirected the user to the domain verifying-mail.us,
9  which requested the T-Mobile employees to enter their employee
10 credentials.

11    <u>Overt Act No. 21:</u>   On or about January 13, 2017, defendant
12 KHUDAVERDYAN emailed a customer a list of 31 T-Mobile IMEI numbers
13 with the subject line: "T-Mobile's done" and the message "These are
14 all unlocked yesterday . . . ."

15    <u>Overt Act No. 22:</u>   On or about January 14, 2017, defendant
16 KHUDAVERDYAN emailed a customer a list of nine T-Mobile IMEI numbers
17 with the subject line: "T-Mobile's done" and the message "Here is the
18 Second Batch that was done!!!"

19    <u>Overt Act No. 23:</u>   On or about February 5, 2017, defendant
20 GHAREHBAGLOO received in his PayPal account ending in 1813
21 approximately $22,000.

22    <u>Overt Act No. 24:</u>   On or about March 29, 2017, defendant
23 KHUDAVERDYAN's T-Mobile employee credential, akhudav1, was used to
24 log into a T-Mobile Wi-Fi access point in Palmhurst, Texas, and then
25 used to access the website unlockitall.com.

26    <u>Overt Act No. 25:</u>   On or about April 28, 2017, defendants
27 KHUDAVERDYAN and GHAREHBAGLOO, using their T-Mobile employee
28 credentials akhudav1 and aghareh1, respectively, attempted to access

T-Mobile's MDU tool from the Wi-Fi access point of the T-Mobile Store on Foothill Boulevard in La Crescenta, California.

Overt Act No. 26:   On or about June 9, 2017, defendant KHUDAVERDYAN engaged the services of a realtor to identify potential locations for his "UbreakIfix business," which defendant KHUDAVERDYAN wanted to be "close enough" to the T-Mobile Store on San Fernando Boulevard in Burbank, California (the "Burbank T-Mobile") or in "very close vicinity" to the T-Mobile Store on Lankershim Boulevard in North Hollywood, California.

Overt Act No. 27:   On or about July 13, 2017, defendant KHUDAVERDYAN registered the domain unlockedlocked.com in the name of "George Gale" with the U.S. domain name service provider NameCheap Inc.

Overt Act No. 28:   On or about July 14, 2017, defendant KHUDAVERDYAN forwarded defendant GHAREHBAGLOO an email from a web designer containing a design for one of their cell phone unlocking websites, unlockedlocked.com, and an instruction to transfer services from the website unlocks247.com to it.

Overt Act No. 29:   On or about August 6, 2017, defendant GHAREHBAGLOO created a document named "week2" which contained approximately 4,525 IMEI numbers associated with services named "T-Mobile 99% PREMIUM BAD IMEI Cleaning for iPhone iPad Samsung etc" and which showed a profit report for the period between July 23 and August 6, 2017 of approximately $12,962.93 in net profit for defendant GHAREHBAGLOO and approximately $16,324.31 in net profit for defendant KHUDAVERDYAN.

<u>Overt Act No. 30:</u>   On or about August 23, 2017, defendant GHAREHBAGLOO, using his PayPal account ending in 1813, paid Individual A approximately $80.

<u>Overt Act No. 31:</u>   On or about August 28, 2017, defendant GHAREHBAGLOO, using his PayPal account ending in 1813, paid Individual A approximately $300.

<u>Overt Act No. 32:</u>   On or about October 5, 2017, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN instructions to pay approximately $7,528 to defendant GHAREHBAGLOO's PayPal account ending in 1813.

<u>Overt Act No. 33:</u>   On or about October 12, 2017, defendant KHUDAVERDYAN used the employee credentials of a T-Mobile employee with the initials C.H. to access T-Mobile's internal network and unlock approximately 144 T-Mobile IMEI numbers.

<u>Overt Act No. 34:</u>   On or about October 13, 2017, defendant KHUDAVERDYAN used C.H.'s employee credentials to access T-Mobile's internal network and unlock approximately 295 T-Mobile IMEI numbers.

<u>Overt Act No. 35:</u>   On or about November 5, 2017, defendant GHAREHBAGLOO instructed defendant KHUDAVERDYAN to be sure to change the MAC address of the digital device used to log into the Wi-Fi networks of the Burbank T-Mobile and the T-Mobile store on Foothill Boulevard in Glendale, California to conduct phone unlocks so that the logons could not be traced back to them.

<u>Overt Act No. 36:</u>   On or about November 6, 2017, defendants KHUDAVERDYAN and GHAREHBAGLOO used the employee credentials of a T-Mobile employee with the initials L.T. to access T-Mobile's internal network from the Wi-Fi access point of the Burbank T-Mobile and

unlock or attempt to unlock approximately 1,222 T-Mobile IMEI numbers.

Overt Act No. 37:   Between on or about November 5 and November 13, 2017, defendant KHUDAVERDYAN used the employee credentials of a T-Mobile employee with the initials A.K. to access T-Mobile's internal network and unlock or attempt to unlock approximately 1,735 T-Mobile IMEI numbers.

Overt Act No. 38:   On or about November 25, 2017, defendants KHUDAVERDYAN and GHAREHBAGLOO used the employee credentials of the T-Mobile employee with the initials M.M. to access T-Mobile's internal network from the Wi-Fi access point of the Burbank T-Mobile and unlock or attempt to unlock approximately 687 T-Mobile IMEI numbers.

Overt Act No. 39:   On or about November 28, 2017, defendant KHUDAVERDYAN confirmed to a customer that defendant GHAREHBAGLOO's report that defendants KHUDAVERDYAN and GHAREHBAGLOO were "close to T-Mobile iPhone unlocking" was true.

Overt Act No. 40:   On or about November 30, 2017, defendant KHUDAVERDYAN messaged a customer that defendants KHUDAVERDYAN and GHAREHBAGLOO were able to successfully unlock T-Mobile iPhones and that they were "gonna make [the customer] rich."

Overt Act No. 41:   On or about December 4, 2017, defendant GHAREHBAGLOO offered to send customers "a picture of the official unlock tool" to assure them that defendants KHUDAVERDYAN and GHAREHBAGLOO had access to T-Mobile's official unlock tool.

Overt Act No. 42:   On or about December 5, 2017, defendant GHAREHBAGLOO modified a document called "STORE," which contained a list of approximately 126 T-Mobile stores located in Southern

California with a notation next to each store, including the word "ok" next to the entry for the Burbank T-Mobile.

Overt Act No. 43:   On or about December 8, 2017, using coded language, defendant GHAREHBAGLOO messaged "Yes we will clean . . . ." to a customer who asked whether defendants KHUDAVERDYAN and GHAREHBAGLOO could "unlock lost/stolen [phones]."

Overt Act No. 44:   On or about December 10, 2017, using coded language, defendant KHUDAVERDYAN messaged an individual associated with unlockblock.com that he had T-Mobile employee credentials and "just need[ed] access to [T-Mobile's] network" in order to perform phone unlocks.

Overt Act No. 45:   On or about December 12, 2017, defendant GHAREHBAGLOO messaged defendant KHUDAVERDYAN with the suggestion that defendant KHUDAVERDYAN "just transfer [defendant GHAREHBAGLOO's] money to [defendant KHUDAVERDYAN's] bank and write [defendant GHAREHBAGLOO] a check" because defendant GHAREHBAGLOO "really [did]n't want to call PayPal" because "It will open up Pandora's box."

Overt Act No. 46:   On or about January 20, 2018, defendant KHUDAVERDYAN used the employee credentials of a T-Mobile employee with the initials W.G. to access T-Mobile's internal network and unlock one T-Mobile IMEI number.

Overt Act No. 47:   On or about February 1, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a list of approximately 134 IMEI numbers.

Overt Act No. 48:   On or about February 10, 2018, using coded language, defendant KHUDAVERDYAN messaged defendant GHAREHBAGLOO that he had a Python script to perform cell phone unlocks, and defendant

16

GHAREHBAGLOO responded that he wanted to "test it" by installing it on their computer.

Overt Act No. 49:   On or about March 10, 2018, defendant KHUDAVERDYAN emailed a potential customer and stated: "Do you have stock that you need unlocked?  I can Help you move your stock if you need Unlocking help."

Overt Act No. 50:   On or about March 10, 2018, defendant KHUDAVERDYAN emailed a potential customer and stated: "Do you guys still need to unlock iPhones??  I can still help you out if you interested in Unlocking iPhones.  We specialize in T-Mobile, Metro and AT&T at the current moment."

Overt Act No. 51:   On or about March 11, 2018, defendant KHUDAVERDYAN used the employee credentials of a T-Mobile employee with the initials S.G. to access T-Mobile's internal network and unlock one T-Mobile IMEI number.

Overt Act No. 52:   On or about March 12, 2018, defendant KHUDAVERDYAN advertised on the internet that one of his and defendant GHAREHBAGLOO's companies, Swift Solutions, "offer[s] Bulk cell phone unlocking services for Wholesalers."

Overt Act No. 53:   On or about April 3, 2018, defendant KHUDAVERDYAN emailed a potential customer and stated: "I can help you to unlock all the iPhones if you are interested.  We have the cheapest and fastest services worldwide."

Overt Act No. 54:   On or about April 4, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO used the employee credentials of a T-Mobile employee with the initials J.H. to access T-Mobile's internal network from the Wi-Fi access point of the Burbank T-Mobile and unlock or attempt to unlock approximately 52 T-Mobile IMEI numbers.

17

1     <u>Overt Act No. 55:</u>  On or about April 5, 2018, defendants

2  KHUDAVERDYAN and GHAREHBAGLOO used the employee credentials of a

3  T-Mobile employee with the initials E.S. to access the Wi-Fi access

4  point of the Burbank T-Mobile by causing Individual A to sit within

5  approximately five feet of the store (because the range of the access

6  point was approximately 20 to 30 feet) with a device that enabled

7  their access.

8     <u>Overt Act No. 56:</u>  On or about April 5, 2018, defendants

9  KHUDAVERDYAN and GHAREHBAGLOO unlocked or attempted to unlock

10  approximately 1,561 T-Mobile IMEI numbers.

11     <u>Overt Act No. 57:</u>  On or about April 5, 2018, defendant

12  KHUDAVERDYAN, using the PayPal account ending in 7206, paid

13  Individual A approximately $200 for providing him and defendant

14  GHAREHBAGLOO access to the Burbank T-Mobile's Wi-Fi access point.

15     <u>Overt Act No. 58:</u>  On or about April 17, 2018, defendant

16  KHUDAVERDYAN forwarded to defendant GHAREHBAGLOO an email from a

17  buyer of unlocking services ("Customer A") with a spreadsheet named

18  "LOCKED METRO PCS AND T-MOBILE PHONES FOR [Customer A's first name]"

19  containing approximately 635 T-Mobile IMEI numbers and 694 MetroPCS

20  IMEI numbers.

21     <u>Overt Act No. 59:</u>  On or about April 17, 2018, defendant

22  GHAREHBAGLOO emailed defendant KHUDAVERDYAN a document named

23  "[Customer A's first name] Invoice.pdf," which was an invoice for

24  approximately $12,070.50 (at a per-unit price of $6.50) from Top Tier

25  Solutions Inc. for approximately 1,857 IMEI numbers that were

26  successfully unlocked.

27     <u>Overt Act No. 60:</u>  On or about April 17, 2018, defendant

28  KHUDAVERDYAN emailed Customer A the invoice prepared by defendant

GHAREHBAGLOO for approximately $12,070.50 for the successful unlocking of approximately 1,857 IMEI numbers.

Overt Act No. 61:   On or about April 18, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO received in their Wells Fargo joint business account for Top Tier Solutions Inc. ending in 5549 approximately $12,070.50 from Customer A.

Overt Act No. 62:   Between on or about April 18 and 25, 2018, using coded language, defendant KHUDAVERDYAN agreed with a customer to unlock 1,000 and then an additional 5,000 cell phones, and the customer followed up after defendant KHUDAVERDYAN confirmed the cell phones had been submitted for unlocking with the following: "It's been 7 days, China keeps asking for unlocking updates."

Overt Act No. 63:   On or about April 18, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO used the employee credentials of a T-Mobile employee with the initials J.W. to access the Wi-Fi access point of the Burbank T-Mobile by causing Individual A to sit in a vehicle within approximately ten to 15 feet of the store with a device that enabled their access.

Overt Act No. 64:   On or about April 18, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO unlocked or attempted to unlock approximately 1,492 T-Mobile IMEI numbers.

Overt Act No. 65:   On or about April 20, 2018, defendant KHUDAVERDYAN quoted a customer a per-unit price of $55 to unlock approximately 248 T-Mobile IMEI numbers.

Overt Act No. 66:   On or about April 21, 2018, defendant KHUDAVERDYAN, using the PayPal account ending in 7206, paid Individual A approximately $500 for providing him and defendant GHAREHBAGLOO access to Burbank T-Mobile's Wi-Fi access point.

Overt Act No. 67:   On or about April 21, 2018, defendant KHUDAVERDYAN, using the Mass Payment feature of his PayPal account ending in 7206, paid Individual A approximately $643 for providing him and defendant GHAREHBAGLOO access to Burbank T-Mobile's Wi-Fi access point.

Overt Act No. 68:   On or about April 24, 2018, defendant KHUDAVERDYAN received an email from Customer A confirming payment for the successful unlocking of approximately 1,857 IMEI numbers.

Overt Act No. 69:   On or about April 24, 2018, defendant KHUDAVERDYAN emailed Customer A an invoice in the amount of $3,334.50 for the successful unlocking of approximately 513 IMEI numbers.

Overt Act No. 70:   From on or about April 24, 2018, through on or about April 25, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO used the employee credentials of a T-Mobile employee with the initials L.K. to access the T-Mobile internal network from the Wi-Fi access point of the Burbank T-Mobile by causing Individual A to sit in a vehicle within approximately 10 to 15 feet of the store with a device that enabled their access.

Overt Act No. 71:   From on or about April 24, 2018, through on or about April 25, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO unlocked or attempted to unlock approximately 4,242 T-Mobile IMEI numbers.

Overt Act No. 72:   On or about April 25, 2018, defendant KHUDAVERDYAN emailed Customer A an invoice for approximately $14,241.50 from Top Tier Solutions Inc. for the successful unlocking of approximately 2,191 IMEI numbers, with follow-up instructions for an additional approximately 2,002 IMEI numbers that were not successfully unlocked.

<u>Overt Act No. 73:</u>   On or about April 25, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO received in their Wells Fargo joint business account for Top Tier Solutions Inc. ending in 5549 approximately $3,334.50 from Customer A.

<u>Overt Act No. 74:</u>   On or about April 30, 2018, defendant KHUDAVERDYAN emailed a customer an invoice for approximately $11,115 (at a discounted per-unit price of $45) from Top Tier Solutions Inc. for approximately 247 T-Mobile IMEI numbers that were successfully unlocked.

<u>Overt Act No. 75:</u>   On or about May 3, 2018, defendant KHUDAVERDYAN received via email from a customer a spreadsheet named "T-Mobile iPhone List 5-3" containing approximately 972 T-Mobile IMEI numbers.

<u>Overt Act No. 76:</u>   On or about May 8, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO received in their Wells Fargo joint business account for Top Tier Solutions Inc. ending in 5549 approximately $7,000 from Customer A.

<u>Overt Act No. 77:</u>   On or about May 9, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named "T_M_Unlock_05_09_2018" containing approximately 1,881 T-Mobile IMEI numbers.

<u>Overt Act No. 78:</u>   On or about May 14, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named "T_M_Unlocks_5_14_2018" containing approximately 625 T-Mobile IMEI numbers.

<u>Overt Act No. 79:</u>   On or about May 17, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named

21

"T_M_Unlocks_5_17_2018" containing approximately 152 T-Mobile IMEI numbers.

Overt Act No. 80:   On or about May 17, 2018, defendant KHUDAVERDYAN emailed to a potential customer the following advertisement for his unlocking services: "Whether the iPhone is clean, financed, blocked or leased, we can perform convenient, factory-grade unlocks on all iPhone and iPad devices that have been iCloud locked without voiding your phone's warranty.  We've been unlocking cell phones for years, and our specialty is in providing competitive, iCloud unlocking services and Clean/Financed T-Mobile iPhone services . . . .  Unlike other companies that use 'hacking unlock' with the possibility of your iPhone being re-locked in the future, our T-mobile unlock is Official and directly through Apple and T-mobile."

Overt Act No. 81:   On or about May 18, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named "T_M_Unlocks_5_18_2018" containing approximately 505 T-Mobile IMEI numbers.

Overt Act No. 82:   On or about May 21, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named "T_M_Unlocks_5_21_2018_626PC" containing approximately 626 T-Mobile IMEI numbers with the message "Todays Orders."

Overt Act No. 83:   On or about May 29, 2018, defendant GHAREHBAGLOO searched the internet for the term "t-mobile block checker."

Overt Act No. 84:   On or about May 29, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named

"T_M_Unlocks_5_29_2018_821PC" containing approximately 821 T-Mobile IMEI numbers.

Overt Act No. 85:   On or about June 1, 2018, defendant KHUDAVERDYAN used the employee credentials of a T-Mobile employee with the initials J.B. to access T-Mobile's internal network and unlock one T-Mobile IMEI number.

Overt Act No. 86:   On or about June 12, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named "T_M_Unlocks_6_12_2018" containing approximately 2,056 T-Mobile IMEI numbers and asked: "[D]o you want to ask the buyers if they want to cancel or should we just submit the orders?"

Overt Act No. 87:   On or about June 21, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named "T_M_Unlocks_6_21_2018_1532PC" containing approximately 1,532 T-Mobile IMEI numbers and stated: "HERE IS THE LIST."

Overt Act No. 88:   On or about August 20, 2018, defendant GHAREHBAGLOO sent defendant KHUDAVERDYAN an email containing a document named "TM_Unlocks_8_20_2018," which listed approximately 1,131 IMEI numbers and phone types.

Overt Act No. 89:   On or about November 24, 2018, defendant GHAREHBAGLOO searched the internet for the term "remote software unlocking."

Overt Act No. 90:   From at least on or about November 28, 2018, through on or about January 18, 2019, defendant GHAREHBAGLOO operated the website skyviewfta.com, which advertised "Samsung Sim Unlocking Software Tool. Remotely unlock your Samsung phone to work with ANY* carrier."

1     <u>Overt Act No. 91:</u>   On or about December 10, 2018, defendant

2  GHAREHBAGLOO sent a customer an email with the subject line

3  "TM_Unlock_Request 12/10/2018" and attached a spreadsheet named

4  "TM_Unlock_12_11_2018," which contained approximately 1,188 iPhone

5  IMEI numbers and a price next to each one, all of which totaled

6  approximately $37,652.50.

7     <u>Overt Act No. 92:</u>   On or about December 28, 2018, defendant

8  GHAREHBAGLOO modified a document named "2018 Counts," which

9  calculated that defendants KHUDAVERDYAN and GHAREHBAGLOO's "TOTAL

10  Combined Profit 2018" for their unlocking business was approximately

11  $6,904,050.84, consisting of approximately $3,452,042.91 in profit

12  for defendant KHUDAVERDYAN and approximately $3,452,007.92 in profit

13  for defendant GHAREHBAGLOO.

14     <u>Overt Act No. 93:</u>   On or about January 6, 2019, defendant

15  GHAREHBAGLOO created images of documents that were being edited with

16  the following text: "Dear T-Mobile Retail Sales Associate, [¶] As

17  part of our security protocol we require you to verify your contact

18  information, please log in to your account and confirm all contact

19  information is correct and updated" and "Dear T-Mobile account

20  Manager [¶] As part of our Quarterly Procudure we require all T-

21  Mobile Mangers to verify there contact information. Please log in to

22  your account and confirm all contact information is correct and

23  updated. [¶] Thank you for your time and service with T-Mobile."

24     <u>Overt Act No. 94:</u>   On or about January 9, 2019, defendant

25  GHAREHBAGLOO, using coded language, messaged a potential customer

26  and, in response to the question, "does your tmobile iphone service

27  support fraud too?" answered, "Yes . . . .  All supported."

28

<u>Overt Act No. 95:</u>   On or about January 19, 2019, defendant GHAREHBAGLOO inquired of a potential customer: "Do you need tmobile unbarring" and messaged, "we will start unbarring premium 24 hours."

<u>Overt Act No. 96:</u>   On or about January 20, 2019, defendant GHAREHBAGLOO, using coded language, messaged a customer the following: "i think my clients are splitting orders[;] they are sending some [T-Mobile IMEIs] to your dealers . . . .  [Defendant KHUDAVERDYAN's] accountant said not to do wash[;] you pay [defendant KHUDAVERDYAN] and he pays you back."

<u>Overt Act No. 97:</u>   On or about January 23, 2019, Individual A told law enforcement that she had never driven the type of vehicle she was observed in outside the Burbank T-Mobile on April 5, April 17-18, and April 24-25, 2018.

<u>Overt Act No. 98:</u>   On or about January 23, 2019, Individual A told law enforcement that she was at the Burbank T-Mobile on April 5, April 17-18, and April 24-25, 2018 because she "was going through a breakup with [her] ex."

<u>Overt Act No. 99:</u>   On or about March 19, 2019, defendant KHUDAVERDYAN messaged a customer stating, "someone snitched on us" and "they sent me a warrant with your name on it too."

<u>Overt Act No. 100:</u>   On or about March 19, 2019, defendant KHUDAVERDYAN told a customer, "I can give you an exclusive price for T-Mobile I really need your business to help Hore these kick ass Attorneys."

<u>Overt Act No. 101:</u>   On or about May 15, 2019, in response to a customer messaging defendant KHUDAVERDYAN to ask, "Do you have tmobile premium also?  The one people are advertising," defendant

KHUDAVERDYAN responded, "Yes I have that" and "I'll give you premium too keep your mouth shut please."

Overt Act No. 102:  On or about June 1, 2019, in response to a customer messaging defendant KHUDAVERDYAN about the status of T-Mobile unlocking by asking, "BRO T-MOBILE APP? . . . PREMIUM?", defendant KHUDAVERDYAN responded, "when access is open . . . . yes."

Overt Act No. 103:  On or about June 1, 2019, in response to a customer messaging defendant KHUDAVERDYAN an IMEI number with the message, "Your device is blocked and will not work on T-Mobile's network," and asking "can unlock this in premium?", defendant KHUDAVERDYAN responded, "Yes we can do this."

Overt Act No. 104:  On or about June 6, 2019, defendant KHUDAVERDYAN and defendant GHAREHBAGLOO caused an unindicted co-conspirator to include IMEIs on a spreadsheet titled "06.06.19.ext.xlsx" for unlocking by T-Mobile, after which the individual fraudulently posed as a legitimate customer of Company A, an approved T-Mobile vendor for bulk unlocking of cell phones, and sent the spreadsheet to an employee at Company A.

COUNTS TWO THROUGH FOUR

[18 U.S.C. §§ 1343, 2(a)]

1. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 19 and 21 through 22 of Count One of this First Superseding Indictment as though fully set forth herein.

A. THE SCHEME TO DEFRAUD

2. Beginning not later than on or about August 26, 2014, and continuing through on or about June 10, 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendants ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN"), and ALEN GHAREHBAGLOO, aka "aghareh1" ("GHAREHBAGLOO"), each aiding and abetting the other, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud T-Mobile and defendants KHUDAVERDYAN and GHAREHBAGLOO's customers as to material matters, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

3. The scheme operated, in substance, as set forth in paragraphs 1 through 19 and 21 through 22 of Count One of this First Superseding Indictment.

B. USE OF WIRES

4. On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants KHUDAVERDYAN and GHAREHBAGLOO, for the purpose of executing the above-described scheme to defraud, transmitted and caused the transmission of the following items by means of wire communication in interstate and foreign commerce:

27

| COUNT | DATE | INTERSTATE WIRING |
|-------|------|-------------------|
| COUNT TWO | 12/16/2016 | Phishing email from defendant KHUDAVERDYAN sent by means of an interstate and foreign wire, namely, from an email account in the name of a T-Mobile employee with the initials M.M. housed at T-Mobile, to T-Mobile employees, including employees with the initials M.G. and F.Z., containing a link that, when clicked on, redirected the user to the domain verifying-mail.us, controlled by defendant KHUDAVERDYAN, which requested the T-Mobile employees to enter their employee credentials |
| COUNT THREE | 5/17/2018 | Email from defendant KHUDAVERDYAN sent by means of an interstate and foreign wire, namely, from an email account housed at Google, to a potential customer advertising defendant KHUDAVERDYAN's cell phone unlocking services, including boasting: "We've been unlocking cell phones for years," and falsely stating: "our T-mobile unlock is Official and directly through Apple and T-mobile" |
| COUNT FOUR | 6/21/2018 | Email from defendant GHAREHBAGLOO sent by means of an interstate and foreign wire, namely, from an email account housed at Google, to defendant KHUDAVERDYAN, attaching a spreadsheet named "T_M_Unlocks_6_21_2018_1532PC" containing approximately 1,532 T-Mobile IMEI numbers |

28

COUNT FIVE

[18 U.S.C. §§ 1344(2), 2(a)]

A.  THE SCHEME TO DEFRAUD

1.   Beginning on a date unknown to the Grand Jury but no later than May 9, 2017, and continuing through at least on or about June 23, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendants ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN"), and ALEN GHAREHBAGLOO, aka "aghareh1" ("GHAREHBAGLOO"), each aiding and abetting the other, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, executed a scheme to obtain monies, funds, and other property owned by and in the custody and control of Chase, by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

2.   The scheme operated, in substance, as follows:

a.   Defendants KHUDAVERDYAN and GHAREHBAGLOO would falsely aver that the purchase of the real property located at 512 S. Via Montana, Burbank, California 91501 (the "Via Montana Residence") was for defendant GHAREGHBAGLOO to live in as his primary residence.

b.   Defendants KHUDAVERDYAN and GHAREHBAGLOO would falsely represent to Chase that the money transferred by defendant KHUDAVERDYAN for the purchase of the Via Montana Residence was a gift for his "cousin" defendant GHAREHBAGLOO.

c.   Defendant KHUDAVERDYAN and not defendant GHAREHBAGLOO would live in the Via Montana Residence as his primary residence.

B.   THE EXECUTION OF THE FRAUDULENT SCHEME

3.   On or about June 21, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendants KHUDAVERDYAN and GHAREHBAGLOO committed the following act, which constituted an execution of the fraudulent scheme: Defendant GHAREHBAGLOO signed a Uniform Residential Loan Application in conjunction with the purchase of the Via Montana Residence averring that it would be his primary residence and that his assets included a "gift" of $613,260.84, when in fact the Via Montana Residence was to be defendant KHUDAVERDYAN's primary residence and the $613,260.84 was not a gift to defendant GHAREHBAGLOO.

COUNT SIX

[18 U.S.C. § 1030(a)(2)(C), (c)(2)(B)(i), (c)(2)(B)(ii)]

On or about December 16, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN"), intentionally accessed a computer without authorization, and thereby obtained information from a protected computer, as that term is defined in Title 18, United States Code, Section 1030(e)(2)(B), that is, from the email server(s) of T-Mobile US, Inc., for the purpose of private financial gain and in furtherance of a criminal act, to wit, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349.

COUNT SEVEN

[18 U.S.C. §§ 1030(a)(4), (c)(3)(A), 2(a)]

Between on or about April 5, 2018, and on or about April 25, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendants ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN") and ALEN GHAREHBAGLOO, aka "aghareh1" ("GHAREHBAGLOO"), each aiding and abetting the other, knowingly and with intent to defraud, accessed and attempted to access a protected computer, as that term is defined in Title 18, United States Code, Section 1030(e)(2)(B), that is, the computer server(s) of T-Mobile US, Inc., without authorization, and by means of such conduct, furthered defendants KHUDAVERDYAN and GHAREHBAGLOO's intended fraud, and obtained a thing of value, namely, $26,312.

                          COUNT EIGHT

              [18 U.S.C. § 1030(a)(4), (c)(3)(A)]

     Between on or about November 6, 2017, and on or about November
13, 2017, in Los Angeles County, within the Central District of
California, and elsewhere, defendant ARGISHTI KHUDAVERDYAN, also
known as ("aka") "Argo," aka "George Gale," aka "akhudav1"
("KHUDAVERDYAN") knowingly and with intent to defraud, accessed and
attempted to access a protected computer, as that term is defined in
Title 18, United States Code, Section 1030(e)(2), that is, the
computer server(s) of T-Mobile US, Inc., without authorization, and
by means of such conduct, furthered defendant KHUDAVERDYAN's intended
fraud and obtained a thing of value, namely, $82,648.50.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT NINE

[18 U.S.C. § 1956(h)]

A.   OBJECTS OF THE CONSPIRACY

1.   Beginning on a date unknown to the Grand Jury but no later than August 24, 2016, and continuing through on or about June 10, 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendants ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN"), and ALEN GHAREHBAGLOO, aka "aghareh1" ("GHAREHBAGLOO"), together with others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed:

a.   to conduct financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, which, in fact, involved the proceeds of specified unlawful activity, namely, conspiracy to commit wire fraud, in violation of United States Code, Section 1349, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.   to engage in monetary transactions in criminally derived property of a value greater than $10,000, which was derived from specified unlawful activity, namely, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and knowing the funds represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1957.

34

B.   MANNER AND MEANS OF THE CONSPIRACY

2.   The objects of the conspiracy were carried out, and to be carried out, in substance, as follows:

a.   Defendants KHUDAVERDYAN and GHAREHBAGLOO would purchase real estate in their own names and in others' names, knowing that the funds used were criminally derived.

b.   Defendants KHUDAVERDYAN and GHAREHBAGLOO would purchase luxury goods such as vehicles and watches, knowing that the funds used were criminally derived.

c.   Defendants KHUDAVERDYAN and GHAREHBAGLOO would make withdrawals, each more than $10,000, from PayPal Inc. ("PayPal") and bank accounts they each controlled individually and jointly, knowing that the funds used were criminally derived.

C.   OVERT ACTS

3.   On or about the following dates, in furtherance of the conspiracy, and to accomplish its objects, defendants KHUDAVERDYAN and GHAREHBAGLOO and others, known and unknown to the Grand Jury, committed and willfully caused others to commit the following overt acts, among others, in the Central District of California, and elsewhere:

Overt Act No. 1:   From on or about August 2, 2016, through on or about September 20, 2018, defendant KHUDAVERDYAN made at least 55 transfers, each $10,000 or over, totaling approximately $4,060,000, from his PayPal account ending in 7206 to his J.P. Morgan Chase & Co. ("Chase") account ending in 6783.

Overt Act No. 2:   On or about May 9, 2017, defendant KHUDAVERDYAN transferred approximately $37,500 from his Chase account ending in 6783 to Inter Valley Escrow for the purchase of the real

property located at 512 S. Via Montana in Burbank, California 91501 (the "Via Montana Residence").

Overt Act No. 3:    On or about May 9, 2017, defendants KHUDAVERDYAN and GHAREHBAGLOO both signed a gift letter in connection with the purchase of the Via Montana Residence asserting that defendant KHUDAVERDYAN's transfer of $37,500 was a "gift" for his "cousin" defendant GHAREHBAGLOO, who is not defendant KHUDAVERDYAN's cousin.

Overt Act No. 4:    On or about May 23, 2017, defendant GHAREHBAGLOO wrote a letter stating that he was "motivated" to buy the Via Montana Residence because his work is "internet based" so he "work[s] from home," and he "will be closer to family and friends" and "will be living in a bigger house."

Overt Act No. 5:    On or about June 19, 2017, defendant KHUDAVERDYAN transferred approximately $613,260.84 from his Chase account ending in 6783 to Inter Valley Escrow for the purchase of the Via Montana Residence.

Overt Act No. 6:    On or about June 19, 2017, defendants KHUDAVERDYAN and GHAREHBAGLOO again signed a gift letter in connection with the purchase of the Via Montana Residence asserting that defendant KHUDAVERDYAN's transfer of $613,260.84 was a "gift" for his "cousin" defendant GHAREHBAGLOO.

Overt Act No. 7:    On or about June 21, 2017, defendant GHAREHBAGLOO signed a Uniform Residential Loan Application in conjunction with the purchase of the Via Montana Residence, on which he averred that it would be his primary residence and that his assets included a "gift" of $613,260.84.

1    <u>Overt Act No. 8:</u>   On or about December 6, 2017, defendant
2    KHUDAVERDYAN emailed his accountant and asked for documents needing
3    his signature to be sent to the Via Montana Residence.

4    <u>Overt Act No. 9:</u>   On or about December 26, 2017, defendant
5    KHUDAVERDYAN transferred approximately $30,000 from his Chase account
6    ending in 6783 to First National Bank of Central Texas for the
7    purchase of a 2017 Land Rover Range Rover Sport sport utility
8    vehicle.

9    <u>Overt Act No. 10:</u>   On or about January 25, 2018, defendant
10   GHAREHBAGLOO transferred approximately $27,500 from his and defendant
11   KHUDAVERDYAN's Wells Fargo Bank ("Wells Fargo") joint business
12   account for Top Tier Solutions Inc. ending in 5549 to Wells Fargo for
13   the lease of a 2017 Mercedes-Benz S 63 AMG® coupe.

14   <u>Overt Act No. 11:</u>   On or about January 31, 2018, defendant
15   KHUDAVERDYAN transferred approximately $21,570 from his Chase account
16   ending in 6783 to Landmark Escrow for the purchase of the real
17   property located at 19715 Eagle Ridge Lane, Los Angeles, California
18   91326 (the "Eagle Ridge Residence").

19   <u>Overt Act No. 12:</u>   On or about March 15, 2018, defendant
20   KHUDAVERDYAN transferred approximately $374,561.56 from his Chase
21   account ending in 6783 to Landmark Escrow for the purchase of the
22   Eagle Ridge Residence.

23   <u>Overt Act No. 13:</u>   On or about March 15, 2018, at 9:21 a.m.,
24   defendant KHUDAVERDYAN sent an email which stated: "House will be
25   rented 19715 Eagle Ridge Lane Northridge, CA 91326 This will be under
26   my sisters name. [Name redacted]. Call me for payment . . . ."

27   <u>Overt Act No. 14:</u>   On or about March 15, 2018, at 9:27 a.m.,
28   defendant KHUDAVERDYAN sent another email and stated: "[Name

redacted] Sorry what I meant to say is I'm buying the house for my sister, she will be living there . . . ."

Overt Act No. 15:   On or about May 1, 2018, defendant KHUDAVERDYAN transferred approximately $32,157.50 from his PayPal account ending in 7206 to Beverly Hills Watch Company for the purchase of an Audemars Piguet Royal Oak watch.

Overt Act No. 16:   On or about June 14, 2018, defendant KHUDAVERDYAN emailed the Assistant Planner for the City of Burbank and stated that he was the owner of the Via Montana Residence.

Overt Act No. 17:   On or about June 21, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO received an email from defendant GHAREHBAGLOO's wife, who was the real estate agent for the purchase of the Eagle Ridge Residence, with the subject line "Lease agreement," which attached a document that stated: "Agreement between [defendant KHUDAVERDYAN's sister], Owner(s), and Alen Gharehbagloo, tenant(s), for a dwelling located at 19715 eagle ridge lane Northridge ca 91326 (location).  Tenant(s) agree to rent this dwelling on a month-to-month basis for $12,900 per month . . . ."

Overt Act No. 18:   On or about July 12, 2018, defendant KHUDAVERDYAN transferred approximately $64,124.30 from his PayPal account ending in 7206 to Creative Bespoke to lease a 2014 Ferrari 458 coupe.

Overt Act No. 19:   On or about September 13, 2018, defendant GHAREHBAGLOO transferred approximately $16,500 from his Wells Fargo account ending in 7435 to Ticor Title Company for the purchase of the business property located 207 West Alameda Avenue, Unit 203, Burbank, California 91502 (the "West Alameda Business").

Overt Act No. 20:   On or about September 28, 2018, defendant GHAREHBAGLOO withdrew $162,753.61 from his Wells Fargo account ending in 7435 in a cashier's check to pay Ticor Title Company for the purchase of the West Alameda Business.

Overt Act No. 21:   On or about December 10, 2018, defendant GHAREHBAGLOO transferred approximately $84,000 from his Wells Fargo account ending in 7435 to Inter Valley Escrow for the purchase of the real property located at 1435 El Vago Street, La Cañada Flintridge, California 91011 (the "La Cañada Flintridge Residence").

Overt Act No. 22:   On or about December 13, 2018, defendant GHAREHBAGLOO transferred approximately $750,000 from his Wells Fargo account ending in 7435 to Inter Valley Escrow for the purchase of the La Cañada Flintridge Residence.

Overt Act No. 23:   On or about December 24, 2018, defendant GHAREHBAGLOO transferred approximately $750,000 from his Wells Fargo account ending in 7435 to Inter Valley Escrow for the purchase of the La Cañada Flintridge Residence.

Overt Act No. 24:   On or about December 26, 2018, defendant GHAREHBAGLOO transferred approximately $685,205 from his US Bank account ending in 4146 to Inter Valley Escrow for the purchase of the La Cañada Flintridge Residence.

COUNT TEN

[18 U.S.C. §§ 1956(a)(1)(B)(i), 2(a)]

On or about June 19, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendants ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN"), and ALEN GHAREHBAGLOO, aka "aghareh1" ("GHAREHBAGLOO"), each aiding and abetting the other, conducted a financial transaction, namely, the transfer of approximately $613,260.84 from defendant KHUDAVERDYAN's J.P. Morgan Chase & Co. account ending in 6783 to Inter Valley Escrow's City National Bank account ending in 2397, on behalf of defendant GHAREHBAGLOO, for the purchase of the real property located at 512 S. Via Montana, Burbank, California 91501, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, which, in fact, involved the proceeds of specified unlawful activity, namely, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds.

COUNT ELEVEN

[18 U.S.C. §§ 1957(a), 2(a)]

On or about June 19, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendants ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN"), and ALEN GHAREHBAGLOO, aka "aghareh1" ("GHAREHBAGLOO"), each aiding and abetting the other, knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000 by making a transfer of approximately $613,260.84 from defendant KHUDAVERDYAN's J.P. Morgan Chase & Co. account ending in 6783 to Inter Valley Escrow's City National Bank account ending in 2397, for the purchase of the real property located at 512 S. Via Montana, Burbank, California 91501, the property involved in the monetary transaction having been derived from specified unlawful activity, namely, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, knowing that the funds involved in the monetary transaction represented the proceeds of some form of unlawful activity.

COUNTS TWELVE THROUGH FOURTEEN

[18 U.S.C. § 1957(a)]

On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN"), knowingly engaged in monetary transactions in criminally derived property of a value greater than $10,000 by making the following transfers, such property having been derived from specified unlawful activity, namely, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, knowing that the funds involved in the monetary transactions represented the proceeds of some form of unlawful activity:

| COUNT | DATE | TRANSFER |
|---|---|---|
| COUNT TWELVE | 12/26/2017 | Transfer of approximately $30,000 from defendant KHUDAVERDYAN's J.P. Morgan Chase & Co. account ending in 6783 to First National Bank of Central Texas account ending in 2637 for the purchase of a 2017 Land Rover Range Rover Sport sport utility vehicle with vehicle identification number SALWZ2FE6HA147419 |
| COUNT THIRTEEN | 1/31/2018 | Transfer of approximately $21,570 from defendant KHUDAVERDYAN's J.P. Morgan Chase & Co. account ending in 6783 to Landmark Escrow's East West Bank account ending in 5649 for the purchase of the real property located at 19715 Eagle Ridge Lane, Los Angeles, California 91326 |
| COUNT FOURTEEN | 3/15/2018 | Transfer of approximately $374,561.56 from defendant KHUDAVERDYAN's J.P. Morgan Chase & Co. account ending in 6783 to Landmark Escrow's East West Bank account ending in 5649 for the purchase of the real property located at 19715 Eagle Ridge Lane, Los Angeles, California 91326 |

COUNTS FIFTEEN THROUGH EIGHTEEN

[18 U.S.C. § 1957(a)]

On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant ALEN GHAREHBAGLOO, also known as "aghareh1" ("GHAREHBAGLOO"), knowingly engaged in monetary transactions in criminally derived property of a value greater than $10,000, by making the following transfers, such property having been derived from specified unlawful activity, namely, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, knowing that the funds involved in

//

//

1  the monetary transactions represented the proceeds of some form of

2  unlawful activity:

| COUNT | DATE | TRANSFER |
|---|---|---|
| COUNT FIFTEEN | 1/25/2018 | Transfer of approximately $27,500 from defendant GHAREHBAGLOO's Wells Fargo Bank joint business account for Top Tier Solutions Inc. ending in 5549 to Wells Fargo account ending in 7380 for the lease of a 2017 Mercedes-Benz S 63 AMG® coupe with vehicle identification number WDDXJ7JB5HA032216 |
| COUNT SIXTEEN | 12/13/2018 | Transfer of approximately $750,000 from defendant GHAREHBAGLOO's Wells Fargo Bank account ending in 7435 to Inter Valley Escrow's City National Bank account ending in 8671 for the purchase of the real property located at 1435 El Vago Street, La Cañada Flintridge, California 91011 |
| COUNT SEVENTEEN | 12/24/2018 | Transfer of approximately $750,000 from defendant GHAREHBAGLOO's Wells Fargo Bank account ending in 7435 to Inter Valley Escrow's City National Bank account ending in 8671 for the purchase of the real property located at 1435 El Vago Street, La Cañada Flintridge, California 91011 |
| COUNT EIGHTEEN | 12/26/2018 | Transfer of approximately $685,205 from defendant GHAREHBAGLOO's U.S. Bank account ending in 4146 to Inter Valley Escrow's City National Bank account ending in 8671 for the purchase of the real property located at 1435 El Vago Street, La Cañada Flintridge, California 91011 |

COUNT NINETEEN

[18 U.S.C. § 1028A(a)(1)]

On or about April 22, 2016 and January 23, 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendant ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN"), knowingly transferred, possessed, and used, without lawful authority, means of identification that defendant KHUDAVERDYAN knew belonged to other persons, that is, the unique employee number and last four digits of the Social Security number of victim C.R. and the unique employee login and employer identification number of victim A.K., during and in relation to the offense of Conspiracy to Commit Wire Fraud, a felony violation of Title 18, United States Code, Section 1349, as charged in Count One of this First Superseding Indictment.

1                              FORFEITURE ALLEGATION ONE

2                             [18 U.S.C. § 981(a)(1)(C)]

3      1.     Pursuant to Rule 32.2 of the Federal Rules of Criminal

4 Procedure, notice is hereby given that the United States of America

5 will seek forfeiture as part of any sentence, pursuant to Title 18,

6 United States Code, Section 981(a)(1)(C) and Title 28, United States

7 Code, Section 2461(c), in the event of any defendant's conviction of

8 the offenses set forth in any of Counts One through Four of this

9 First Superseding Indictment.

10      2.     Any defendant so convicted shall forfeit to the United

11 States of America the following property:

12           a.     All right, title and interest in any and all property,

13 real or personal, constituting, or derived from, any proceeds

14 traceable to the offense, including but not limited to the following:

15                   • Real property commonly known as 19715 Eagle Ridge

16                       Lane, Los Angeles, California 91326 (APN 2701-013-

17                       080);

18                   • Real property commonly known as 512 South Via

19                       Montana, Burbank, California 91501 (APN 5608-002-

20                       023) (the "Via Montana Residence");

21                   • Real property commonly known as 1435 El Vago

22                       Street, La Cañada Flintridge, California 91011 (APN

23                       5864-018-005);

24                   • Real property commonly known as 207 West Alameda

25                       Avenue, Unit 203, Burbank, California 91502 (APN

26                       2451-034-095);

27                   • $433,687.55 seized from PayPal account ending in

28                       7206;

- $3,000 seized from PayPal account ending in 4961;
- $435,178.53 seized from J.P. Morgan Chase & Co. ("Chase") account ending in 6783;
- $600,000 seized from Chase account ending in 7980;
- $8,085.11 seized from PayPal account ending in 1813;
- $519,700.69 seized from Wells Fargo Bank account ending in 7435;
- $250,000 seized from Wells Fargo Bank account ending in 9967;
- $12,740 in U.S. currency seized from the Via Montana Residence; and
- One Rolex Sky-Dweller watch with serial number 58P174943 seized from the Via Montana Residence.

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph a.

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1      FORFEITURE ALLEGATION TWO

2      [18 U.S.C. § 982(a)(2)(A)]

3      1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4  Procedure, notice is hereby given that the United States of America

5  will seek forfeiture as part of any sentence, pursuant to Title 18,

6  United States Code, Section 982(a)(2), and Title 28, United States

7  Code, Section 2461(c), in the event of any defendant's conviction of

8  the offenses set forth in any of Count Five of this First Superseding

9  Indictment.

10     2.    Any defendant so convicted shall forfeit to the United

11  States of America the following:

12         a.    All right, title and interest in any and all property,

13  real or personal, constituting, or derived from, any proceeds

14  obtained, directly or indirectly, as a result of the offense,

15  including but not limited to the following:

16         • Real property commonly known as 512 South Via

17           Montana, Burbank, California 91501 (APN 5608-002-

18           023).

19         b.    To the extent such property is not available for

20  forfeiture, a sum of money equal to the total value of the property

21  described in subparagraph a.

22     3.    Pursuant to Title 21, United States Code, Section 853(p),

23  as incorporated by Title 18, United States Code, Section 982(b) and

24  Title 28, United States Code, Section 2461(c), any defendant so

25  convicted shall forfeit substitute property, up to the total value of

26  the property described in the preceding paragraph if, as the result

27  of any act or omission of said defendant, the property described in

28  the preceding paragraph, or any portion thereof: (a) cannot be

48

located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1

                          FORFEITURE ALLEGATION THREE

2

                      [18 U.S.C. §§ 982(a)(2)(B), 1030]

3       1.     Pursuant to Rule 32.2 of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States of America

5   will seek forfeiture as part of any sentence, pursuant to Title 18,

6   United States Code, Sections 982 and 1030 and Title 28, United States

7   Code, Section 2461(c) in the event of any defendant's conviction of

8   the offenses set forth in any of Counts Six through Eight of this

9   First Superseding Indictment.

10      2.     Any defendant so convicted shall forfeit to the United

11  States of America the following:

12          a.    All right, title and interest in any and all property,

13  real or personal, constituting, or derived from, any proceeds

14  obtained, directly or indirectly, as a result of the offense,

15  including but not limited to the following:

16      • Real property commonly known as 19715 Eagle Ridge

17        Lane, Los Angeles, California 91326 (APN 2701-013-

18        080);

19      • Real property commonly known as 512 South Via

20        Montana, Burbank, California 91501 (APN 5608-002-

21        023) (the "Via Montana Residence");

22      • Real property commonly known as 1435 El Vago

23        Street, La Cañada Flintridge, California 91011 (APN

24        5864-018-005);

25      • Real property commonly known as 207 West Alameda

26        Avenue, Unit 203, Burbank, California 91502 (APN

27        2451-034-095);

28

- $433,687.55 seized from PayPal account ending in 7206;
- $3,000 seized from PayPal account ending in 4961;
- $435,178.53 seized from J.P. Morgan Chase & Co. ("Chase") account ending in 6783;
- $600,000 seized from Chase account ending in 7980;
- $8,085.11 seized from PayPal account ending in 1813;
- $519,700.69 seized from Wells Fargo Bank account ending in 7435;
- $250,000 seized from Wells Fargo Bank account ending in 9967;
- $12,740 in U.S. currency seized from the Via Montana Residence; and
- One Rolex Sky-Dweller watch with serial number 58P174943 seized from the Via Montana Residence.

b.   Any personal property used or intended to be used to commit the offense; and

c.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs a and b.

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b) and 1030(i), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due

diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION FOUR

[18 U.S.C. § 982(a)(1)]

1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts Nine through Twenty of this First Superseding Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

    a.   Any property, real or personal, involved in such offense, and any property traceable to such property, including but not limited to the following:

- Real property commonly known as 19715 Eagle Ridge Lane, Los Angeles, California 91326 (APN 2701-013-080);

- Real property commonly known as 512 South Via Montana, Burbank, California 91501 (APN 5608-002-023) (the "Via Montana Residence");

- Real property commonly known as 1435 El Vago Street, La Cañada Flintridge, California 91011 (APN 5864-018-005);

- Real property commonly known as 207 West Alameda Avenue, Unit 203, Burbank, California 91502 (APN 2451-034-095);

- $433,687.55 seized from PayPal account ending in 7206;

- $3,000 seized from PayPal account ending in 4961;
- $435,178.53 seized from J.P. Morgan Chase & Co. ("Chase") account ending in 6783;
- $600,000 seized from Chase account ending in 7980;
- $8,085.11 seized from PayPal account ending in 1813;
- $519,700.69 seized from Wells Fargo Bank account ending in 7435;
- $250,000 seized from Wells Fargo Bank account ending in 9967;
- $12,740 in U.S. currency seized from the Via Montana Residence; and
- One Rolex Sky-Dweller watch with serial number 58P174943 seized from the Via Montana Residence.

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph a.

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), the defendant, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty. Substitution of assets shall not be

ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000 or more in any 12-month period.

1                    FORFEITURE ALLEGATION FIVE

2            [18 U.S.C. §§ 982(a)(2)(B), 1028]

3     1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States of America

5   will seek forfeiture as part of any sentence, pursuant to Title 18,

6   United States Code, Sections 982 and 1028 and Title 28, United States

7   Code, Section 2461(c) in the event of any defendant's conviction of

8   the offense set forth in Counts Twenty-One and Twenty-Two of this

9   First Superseding Indictment.

10    2.   Any defendant so convicted shall forfeit to the United

11  States of America the following:

12        a.   All right, title and interest in any and all property,

13  real or personal, constituting, or derived from, any proceeds

14  obtained, directly or indirectly, as a result of the offense,

15  including but not limited to the following:

- Real property commonly known as 19715 Eagle Ridge Lane, Los Angeles, California 91326 (APN 2701-013-080);

- Real property commonly known as 512 South Via Montana, Burbank, California 91501 (APN 5608-002-023) (the "Via Montana Residence");

- Real property commonly known as 1435 El Vago Street, La Cañada Flintridge, California 91011 (APN 5864-018-005);

- Real property commonly known as 207 West Alameda Avenue, Unit 203, Burbank, California 91502 (APN 2451-034-095);

- $433,687.55 seized from PayPal account ending in 7206;
- $3,000 seized from PayPal account ending in 4961;
- $435,178.53 seized from J.P. Morgan Chase & Co. ("Chase") account ending in 6783;
- $600,000 seized from Chase account ending in 7980;
- $8,085.11 seized from PayPal account ending in 1813;
- $519,700.69 seized from Wells Fargo Bank account ending in 7435;
- $250,000 seized from Wells Fargo Bank account ending in 9967;
- $12,740 in U.S. currency seized from the Via Montana Residence; and
- One Rolex Sky-Dweller watch with serial number 58P174943 seized from the Via Montana Residence.

b.   Any personal property used or intended to be used to commit the offense; and

c.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs a and b.

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b) and 1028(g), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due

1 diligence; (b) has been transferred, sold to or deposited with a

2 third party; (c) has been placed beyond the jurisdiction of the

3 court; (d) has been substantially diminished in value; or (e) has

4 been commingled with other property that cannot be divided without

5 difficulty.

6                                       A TRUE BILL

7

8                              _____

9                              Foreperson

10 TRACY L. WILKISON
   United States Attorney
11

12

13 CHRISTOPHER D. GRIGG
   Assistant United States Attorney
14 Chief, National Security Division

15 CAMERON L. SCHROEDER
   Assistant United States Attorney
16 Chief, Cyber & Intellectual
     Property Crimes Section
17

18 LISA E. FELDMAN
   ANDREW M. ROACH
19 Assistant United States Attorneys
   Cyber & Intellectual Property
20   Crimes Section

21

22

23

24

25

26

27

28